[Crim. No. 20226. Oct. 15, 1979.]

In re RICHARD PRICE et al., on Habeas Corpus.

**COUNSEL**

Smith, Snedeker & Comiskey, Michael R. Snedeker and Paul W. Comiskey for Petitioners.

Quin Denvir, State Public Defender, Richard L. Phillips and Richard E. Shapiro, Deputy State Public Defenders, as Amici Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General,

W. Eric Collins and Alvin J. Knudson, Deputy Attorneys General, for Respondent.

Rufus Edmisten, Attorney General (North Carolina), Jacob L. Safron, Deputy Attorney General, Frank J. Kelley, Attorney General (Michigan), William J. Mullaney, Assistant Attorney General, Wayne L. Kidwell, Attorney General (Idaho), Lynn E. Thomas, Deputy Attorney General, Mark Thompson, Ronald Y. Amemiya, Attorney General (Hawaii), Michael A. Lilly, Deputy Attorney General, Mike Greely, Attorney General (Montana), Mike McCarter, Assistant Attorney General, Slade Gorton, Attorney General (Washington), William C. Collins, Assistant Attorney General, Marshall Coleman, Attorney General (Virginia), Burnett Miller III, Assistant Attorney General, Robert L. Shevin, Attorney General (Florida), John Ashcroft, Attorney General (Missouri), Neil MacFarlane, Assistant Attorney General, James C. Martin, Daniel R. McLeod, Attorney General (South Carolina), Robert B. Hansen, Attorney General (Utah), Michael L. Deamer, Deputy Attorney General, Richard C. Turner, Attorney General (Iowa), Gary L. Hayward, Assistant Attorney General, Robert A. Ellison, Assistant Attorney General (Virgin Islands), Curt T. Schneider, Attorney General (Kansas), Roger N. Walter, Assistant Attorney General, Toney Anaya, Attorney General (New Mexico), Ralph W. Muxlow II, Assistant Attorney General, Lee Carl Bromberg, Special Assistant Attorney General (Massachusetts), John L. Hill, Attorney General (Texas), Richel Rivers, Assistant Attorney General, Robert E. DeLong, William J. Brown, Attorney General (Ohio), Richard Farrin, Assistant Attorney General, Julius C. Michaelson, Attorney General (Rhode Island), William Brody, Assistant Attorney General, Richard R. Wier, Jr., Attorney General (Delaware), and John A. Parkins, Jr., Assistant Attorney General, as Amici Curiae on behalf of Respondent.

---

**OPINION**

**MOSK, ▆▆▆▆** Petitioners sought permission from the administration of Soledad Prison to hold meetings of the Prisoners Union, at which not only inmates but outside members and guests would be present. Their request for approval of the organization as an "inmate activity group" was rejected, and a subsequent appeal to the Director of Corrections was denied.

The petitioners then sought a writ of habeas corpus in the Superior Court of Monterey County. After an evidentiary hearing, the court denied the petition. We issued an order to show cause.

The trial judge stated the issue: "the rights claimed by Petitioners are such that, in the abstract, cannot be denied. The question therefore is whether the reasonable security of this institution . . . justified their denial." The relationship of the claimed rights to reasonable security is invoked by reference to the provisions of Penal Code section 2600: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

In a well-reasoned written opinion, the trial judge reviewed the evidence and the conflicting theories of the parties. The following facts and contentions emerge from the trial court's findings:

Approximately 3,000 state prisoners in California are members of the Prisoners Union. Some 300, of whom 40 are dues paying members, are in the Soledad facility. The organization has a formal corporate structure, and membership outside the institution which includes former inmates. Its president is a former inmate.

The Prisoners Union has proclaimed the following goals: (1) to collectively bargain with the correctional department, support convict-initiated prison change, and seek redress for convict grievances;[1] (2) to end economic exploitation by gaining the right to a prevailing wage for all work done in prison; (3) to establish a uniform sentencing structure and the abolition of indeterminate sentencing;[2] (4) to restore civil and human rights to convicts and ex-convicts.

Petitioners prefer to define the goal of collective bargaining as the right to meet and confer or to negotiate grievances through peaceful and rational persuasion with prohibition of the traditional strike as a bargaining weapon.

Respondent Director of Corrections on the other hand urges that, regardless of the label attached to the process, the strike and the

---

[1] There are existing, well-defined grievance procedures for individual convicts.

[2] This goal is now moot; indeterminate sentencing has been abolished in California.

withdrawal of good behavior are the only realistic consequences of group representation on issues such as conditions of confinement. The Prisoners Union acknowledges that picketing of prison facilities by outside sympathizers might be employed in connection with the negotiation of disputes.

Respondents further contend that recognition of the organization as an activity group would result in the exertion of pressure on inmates to join and to vote on union policy, the infiltration by illegal inmate gangs, the increase of factionalism by inmates, the decline of discipline, increased potential for violence, and upsetting of the delicate balance essential to proper operation of a prison facility. Respondents further claim that the very nature of the Soledad facility, being one of tight security, housing relatively young offenders, renders the existence of a union therein even more dangerous.

Petitioners, on the other hand, insist that no exertion of pressure on inmates to join would occur, that voting would be through secret ballot and thus not subject to coercion, that inmate gangs would not attempt to infiltrate because of the Union's openness and lawful methods, that communication between prisoners and staff would be improved, that prisoner frustrations would be alleviated through the mutual aid and support supplied by the association and that overall potential for violence would be diminished.

The Prisoners Union appears to be the product of an informed segment of our society with sentiments at odds with much of the traditional system of prison operation and administration. It seeks to eliminate all injustice in prisoner treatment, discipline, labor, and general conditions, through the vehicles of individual and group representation, negotiation and a representative grievance procedure. The Union also aspires to effect legislative change in these areas and in the areas of wages for prison labor and sentencing laws.

In their petition to this court, petitioners insist that "being able to participate in Prisoners Union meetings is a fundamental right." The nature of this claimed fundamental right is not delineated.

If the right asserted is that of association, then it is undeniably illusory.[3] Manifestly, one of the basic rights enjoyed by all free citizens, and

[3] Rights of association are not totally denied. Membership in the union is permitted, as are individual visitation and correspondence with outside union representatives.

necessarily denied to prisoners, is the right of association. By the very nature of imprisonment prisoners are separated from their families, their friends, and their business or social associates. Even in confinement their ability to effect associations among others equally confined is circumscribed by assignment of quarters and work duties. No legislative intent indicates, and no case law holds, that such restrictions on the right of association are invalid.

If other constitutional rights are asserted, then we need be detained only momentarily. That the restriction on the union offends no constitutional right was unequivocally determined by the United States Supreme Court in *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119 [53 L.Ed.2d 629, 97 S.Ct. 2532].

Therefore we turn for guidance to the statute involved: Penal Code section 2600 which limits a prisoner's deprivation to only such rights "as is necessary in order to provide for the reasonable security of the institution in which he is confined. . . ."

In that context, then, we must determine whether the instant regulation is reasonable (*In re Jordan* (1974) 12 Cal.3d 575 [116 Cal.Rptr. 371, 526 P.2d 523]; *In re Harrell* (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504, 470, P.2d 640]) or, conversely, whether the prison administration is unreasonable in its concern that prisoners' union meetings and activities are a potential threat to the security of penal institutions. ■ The law is clear that maintenance of security in prisons is a legitimate interest of the state and its officials. (*Wolff* v. *McDonnell* (1974) 418 U.S. 539, 561 [41 L.Ed.2d 935, 94 S.Ct. 2963].)

■ In his presentation to this court the prison director has emphasized several potential security apprehensions inherent in prisoners' union activities.[4] These may be categorized roughly as follows:

1. Petitioning for redress of grievances, an avowed union purpose, has a peaceful ring, but if the petition is rejected and since thereafter normal union economic pressures are unavailable, strikes and disruption are the only available courses of action for prisoner members.

2. Unions, to be effective, must be expansive in membership. Recruiting activities, in a prison environment, will inevitably lead to threats and

[4]The Attorney General of California, appearing for the Department of Corrections, is supported by an amici curiae brief signed by the attorneys general of 20 states.

coercion. This is particularly so in such a setting, where there are inherent conflicts between short-term and long-term prisoners.

3. Membership solicitation activities lend themselves to infiltration of the union organization, and possible seizure, by existing prison gangs which have exhibited a propensity for violence and other antisocial behavior.

4. The present proceedings involve the prison at Soledad. Even if ultimate experimentation might prove a tolerable risk elsewhere, Soledad has had a history of violent disruption by inmates. Confined at Soledad is a volatile group of younger inmates many of whom have committed crimes of violence.

5. Ability of outside union representatives and members—nonrelatives and nonattorneys—to have regular contact with inmates poses a problem because the conduct and influence of noninmates are not subject to monitoring by prison officials.

By any objective appraisal, the foregoing apprehensions are not inconsequential, and therefore they do not result in the imposition of unreasonable restrictions upon prisoners' rights enumerated in Penal Code section 2600. (For a discussion of the "limits of correctional reform" see Silberman, Criminal Violence, Criminal Justice (1978) pp. 371-423.)

Prisons differ substantially from a free society. The melancholy fact is that they are populated by an inordinate number of persons who have previously resorted to violence. Any form of concerted activity among that populace, particularly when directed to grievances and complaints and encouraged by outside persons, appears calculated to create potentially explosive situations.

We reach our conclusion despite the laudable premises implied in the petition that peaceful redress of grievances is always preferable to violent confrontation, that a sharpening of wits in meetings of peers and administrators is more desirable than a sharpening of knives in preparation for assaults on peers or administrators, and that prison inmates are more likely to respond rationally when treated with dignity and civility than with abasement and humiliation. From those premises, however, we find it a giant leap to an unwarranted conclusion that the prison administration has abused its discretion in satisfying legitimate safety concerns.

We recognize that circumstances may change in the future: the goals and membership of the Prisoners Union may undergo revision, the security of penal institutions may become more effective and less restrictive of necessity, penal administrative officials may find methods of achieving an accommodation with those purposes and activities of the prisoners' organization that are meritorious. Thus our conclusion is not carved in stone and should not be interpreted as a permanent prohibition against reasonable prisoner activities proposed by the union. We decide merely that as a court we cannot second-guess the present determination of the prison administration that Prisoners Union meetings pose a potential threat to the reasonable security of penal institutions. Under separation of powers this is, as recently described by the United States Supreme Court, a judgment call "confided to officials outside of the Judicial Branch of Government." (*Bell* v. *Wolfish* (1979) 441 U.S. 520, 562 [60 L.Ed.2d 447, 484, 99 S.Ct. 1861, 1886].)

The order to show cause is discharged.

The petition is denied.

Clark, J., Richardson, J., and Manuel, J., concurred.

**CLARK, J.**—Finding the majority's analysis of the dangers inherent in union activity among prison inmates entirely persuasive, I concur in the judgment and opinion of the court. I would merely add that the same considerations leading the court to uphold rules regulating such activity in this case led me to conclude that related rules should have been upheld in *In re Reynolds, ante,* p. 131 [157 Cal.Rptr. 892, 599 P.2d 83] (right of inmates to wear prisoners union lapel button) and *In re Brandt, ante,* p. 136 [157 Cal.Rptr. 894, 599 P.2d 86] (right of parolees to carry on official prisoners union correspondence with inmates).

**NEWMAN, J.,** Dissenting.—The trial court in this case ruled that Prisoners Union (Union) meetings are properly disallowed because "a prisoners' Union is incompatible with current lawful policies of penological confinement. Its existence would violate institutional security."

The court's first ground, incompatibility with current policies, is inadequate justification under Penal Code section 2600 for depriving inmates of their rights. As for "institutional security," though we may give weight to the court's conclusion we are not bound by it. My own

review of the evidence persuades me that respondent has not presented an adequate showing that reasonable institutional security requires the deprivation.

Respondent Director of Corrections states that, though he prohibits group activity by the Union, inmates are permitted to become members, to receive the Union's newspaper, and individually to correspond with and be visited by outside members (unless they are prohibited from corresponding or visiting for valid reasons other than Union affiliation).[1] However, since meetings in prison are allowed only to institution-approved activity groups, the Union now desires and seeks that formal status. Soledad prison officials have permitted group meetings with outside members for such groups as Alcoholics Anonymous, the Drug Abuse and Addiction Group, and the Duplicate Bridge Group.

Respondent's argument that alternative means exist misses the point. The approved grievance procedure provides for processing of individual complaints but not for group discussion; also, the airing of grievances is but one of the Union's aims. As for the approved Men's Advisory Council, it is initiated by prison officials pursuant to regulation (Cal. Admin. Code, tit. 15, § 3230) and is completely subject to their control (Cal. Admin. Code, tit. 15, § 3232 ("the inmate is obligated to abide by all institution procedures and conditions for participation")). Neither the grievance procedure nor the council can accurately be called an alternative means for the exercising of rights of assembly, association, and speech that petitioners seek through these Union meetings. Thus we turn to the question of the legality, under section 2600, of depriving petitioners of those rights.

*Section 2600 and its interpretation*

Originally the Penal Code contemplated "civil death" for prisoners. Even after a 1968 amendment, section 2600 provided that "sentence of imprisonment in a state prison for any term suspends all the civil rights of the person," though the sentencing judge and the Adult Authority had discretion to restore certain rights. The 1968 amendment did provide,

---

[1] Respondent's permissiveness concerning individual Union activity, though not a material issue here, is disputed by petitioners. In their traverse they allege and present evidence of denial of individual membership cards and correspondence. The recent case of *In re Brandt, ante,* page 136 [157 Cal.Rptr. 894, 599 P.2d 86] finds respondent defending his ban on inmate correspondence with a parolee on the ground that the correspondence involves Union business. *In re Reynolds, ante,* page 131 [157 Cal.Rptr. 892, 599 P.2d 83] concerns his ban on the wearing of Union buttons by inmates.

however, that four basic rights were retained: to inherit property, to correspond confidentially with lawyers and public officials, to own written material produced during imprisonment, and to purchase, receive, and read published writings (subject to specified exceptions). Also it was judicially proclaimed that "In this state we have long since abandoned the medieval concept of strict 'civil death' and have replaced it with statutory provisions seeking to insure that the civil rights of those convicted of crime be limited only in accordance with legitimate penal objectives." (*In re Harrell* (1970) 2 Cal.3d 675, 702 [87 Cal.Rptr. 504, 470 P.2d 640].)

After 1968 several disputes concerning section 2600 reached this court. In all, California Department of Corrections (CDC) rules or actions were invalidated. (*In re Harrell, supra,* 2 Cal.3d 675, cert. den. 401 U.S. 914 [27 L.Ed.2d 814, 91 S.Ct. 890]; *In re van Geldern* (1971) 5 Cal.3d 832 [97 Cal.Rptr. 698, 489 P.2d 578]; *In re Jordan* (1972) 7 Cal.3d 930 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Jordan* (1974) 12 Cal.3d 575 [116 Cal.Rptr. 371, 526 P.2d 523]; *Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565].)

In 1975 the Legislature again amended section 2600, not only expanding the list of enumerated rights (now in § 2601) but also reversing the "civil death" presumption. It now commands that a prisoner may "be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

Since the 1975 revision the statute has guaranteed that inmates retain the same rights as nonprisoners and usually to the same extent. The only objectives that justify abrogating their rights more than those of other individuals are reasonable security of the institution and reasonable protection of the public. Further, it is not enough that the abrogation be *desired* or *useful* or *consistent* with institutional security or with public protection; it must be *necessary*.

The statute is clear, and courts should continue to require that corrections officials comply with it as did this court in *In re Harrell, supra,* 2 Cal.3d 675. There an earlier version of section 2600 specified reasons for which officials could impinge on a prisoner's right to receive written material. Rehabilitation was not one of those reasons; CDC cited it as the justification for a rule excluding material; and the court invalidated the rule as violating section 2600. (*Id.,* at pp. 703-704.)

Similarly, under present section 2600, no facts other than those regarding reasonable institutional security or public protection should be accepted as justifying deprivation of prisoners' rights to hold Union meetings. Respondent's references in his return to "rehabilitation" and "discretion to accommodate those groups which appear to promise the greatest benefit" are, therefore, irrelevant juridically to the issue of depriving prisoners of their rights. Further, the statute specifies *reasonable* security and protection. The Legislature thus recognized that goals of *absolute* security and protection might lead to intolerable deprivations.

### The showing here

It seems clear that respondent's main objection to the Union concerns its goal of collective bargaining. I discuss below his showing on that point. In addition he predicts certain security problems not necessarily related to the goals or content of Union meetings—potential for violence, possible takeover by a violent gang, possible use of force in soliciting members. The occurrence of any of those consequences could of course affect the security of the institution. Yet respondent's showing to support those predictions and his conclusion that an absolute ban is necessary are indeed not adequate.

Respondent testified that "any kind of mass activity has a potential in it for destructive activity." That general statement does not explain a ban in this specific case, particularly since other groups of inmates are allowed to meet. Respondent admitted that the prison has used various mechanisms to protect security when other groups meet (e.g., prior notice, search of outside participants, staff presence, suspension of meetings in case of security threat, disciplinary sanctions). He admitted also that he knew of no misbehavior by any Union members in or out of prison arising out of Union activities, and of no instance where Union officers had threatened or jeopardized prison security in any way. He gave no indication that he knew of any violence at prisoners' union meetings in other states.

As for the possibility of takeover by a gang, respondent offered the unsupported conclusion that he was sure gangs would try to use the Union once it was recognized because gangs "are always looking for vehicles." Again he failed to distinguish the Union from groups that do meet and indicated no knowledge of any gang involvement in any prisoners' union. Petitioners' witnesses, including the chief deputy director of CDC, expressed a belief that the Union's open meetings and

free, supervised elections would minimize the possibility of gang takeover.

Respondent testified that, in his experience, prison recruiting may take the form of threats and physical force. He also stated that it may take legitimate forms. He did not specify whether or why he expected violent forms in this case, and he testified that he had no knowledge of any threats or violence in past Union recruiting. He concluded his testimony by stating that he had not seen prison security threatened by the way the Union here has moved toward its goals.

On this record I find that Union meetings and discussions in themselves apparently pose no security threat that requires blanket disapproval at Soledad. Respondent contends that the case should turn on the broader issue of security risks in inmate collective bargaining. The trial court took a similar approach. However, petitioners in this proceeding are seeking only to hold meetings to discuss Union goals, one of which is collective bargaining. They do not now seek recognition as a bargaining unit[2] or ask that respondent be required to bargain or meet and confer or negotiate with them, and it appears they have no immediate plans to do so. However, to the extent that ultimate goals of the group may be expected to affect their immediate actions the collective bargaining question is relevant.

I note first that respondent's opposition to collective bargaining is based on his own understanding of that goal, which appears to be different from the Union's. He testified to his conviction that collective bargaining would be based on inmate strikes and withdrawal of good behavior, which he believes would create a serious security problem. He admitted on cross-examination that he had no knowledge of the Union's ever advocating such action.

Petitioners' evidence, on the other hand, shows that Union goals are nonviolent; its methods have been to use available legal channels; and it actively has discouraged strikes. The idea for the Union as a group arose out of dissatisfaction with strikes, which seemed counterproductive in prison. Instances were cited of Union members' dissuading other inmates from striking, and members testified that they will continue that policy in

[2]Some prisoners' unions in other states have sought from state agencies recognition as bargaining units. Respondent presented one witness who testified about recognition of a group by the Massachusetts Department of Human Resources. See also Rudovsky et al., The Rights of Prisoners: The Basic ACLU Guide to a Prisoner's Rights (1977) pages 71-74.

the future. The chief deputy director of CDC testified that his only experience with Union involvement in conflicts concerned a recent Susanville "situation" where the Union had an opportunity to act in an inflammatory manner but instead cooperatively helped to resolve the problems. The Union's president pointed to its long-standing policy not to violate statutes or CDC rules, and respondent did not cite any instance to the contrary. Petitioners claim, without contradiction, that they consistently use legal channels, such as the instant proceeding, to oppose statutes, rules, and CDC action that they disapprove.

The Union witnesses discussed collective bargaining in terms of meeting and conferring or negotiating grievances through peaceful and rational persuasion. The testimony indicates that the Union hopes to develop a workable structure for negotiation with prison officials. The parties have pointed to authority on both sides of the question whether inmates should be involved in decision making on the conditions of life in prison. Whatever the merits of those policy arguments, I am far from persuaded that all forms of group representation in negotiation threaten security. Nor does it appear necessary to preclude meetings where such negotiation is discussed.

Petitioners predict that a prisoners' union would improve communication between prisoners and staff and that prisoner frustrations thereby would be alleviated and the potential for violence reduced. Respondent wrote in his initial refusal letter that such beneficial results might occur and "I do not feel that the idea of an organization of inmates to deal with the institutional administration on common problems is entirely without merit." Respondent's other witness testified that he would recommend approval of any inmate organization providing the kind of access discussed in the trial court, except for collective bargaining; but his understanding of collective bargaining clearly did not include meet and confer or other negotiation forms considered by the Union. The CDC chief deputy director testified that in his opinion conventional notions of collective bargaining, inapplicable to a prison situation, were preventing acceptance of the Union; his testimony and that of all the other witnesses indicates that it is the prison officials, not the Union, who harbor the misunderstanding.

Finally respondent argues that no one can guarantee that the composition, leadership, and methods of the group will not change. I agree, taking note though of petitioners' evidence of the Union's stability over its 10-year history. At any rate, respondent has the authority to prohibit

Union activity or otherwise protect institutional security whenever required in response to change.

In sum, though we must respect respondent's professional judgment he has provided us with little or no support for his speculations, beliefs, and fears regarding the true security threat posed by the exercise of the important rights involved here. As the chief deputy director testified, changes in the prison system almost invariably have been anticipated with fear by CDC. We have witnessed the prison officials' resistance in numerous cases in this court (and in the United States Supreme Court), and we have repeatedly ordered reforms in spite of those fears.[3] Respondent's fears and resistance in this case have not been supported by a showing that meets the requirements of section 2600. We should not permit the deprivation of prisoners' rights on the basis of unsupported speculations and apprehensions. It is not a matter of our second-guessing prison officials' judgment. Rather we should declare illegal their actions that violate the Legislature's mandate.

*Standard of review*

The most relevant, recent prisoners' rights case is *Jones* v. *North Carolina Prisoners' Labor Union, supra,* 433 U.S. 119, where on facts similar to those before us the court held constitutional a ban on meetings and various other union activities. The court ruled that: a prisoner retains only those rights not inconsistent with legitimate penological objectives; since prison officials know best how to achieve those objectives, a court should uphold regulations justified by any rational beliefs of the officials; unless it is conclusively shown that those views are wrong the regulations should be upheld. *Jones* seems to be a return to a previously repudiated "hands-off" doctrine on prisons. (See Comment, *The Future of Prisoners' Unions: Jones* v. *North Carolina Prisoners' Labor Union* (1978) 13 Harv.Civ. Rights-Civ. Lib. L.Rev. 799, 802-804. Though the *Jones* majority opinion relies on earlier cases, none of them seems to set as low a standard of review of alleged infringement of prisoners' rights as does *Jones.* Respondent suggests here that we interpret California law in accordance with those cases even if we shun the *Jones* analysis.

Two major decisions concern California prisons: *Pell* v. *Procunier* (1974) 417 U.S. 817 [41 L.Ed.2d 495, 94 S.Ct. 2800] (ban on face-to-face

---

[3]See dissenting opinion of Marshall, J., in *Jones* v. *North Carolina Prisoners' Labor Union* (1977) 433 U.S. 119 at page 142 [53 L.Ed.2d 629 at .p. 649]: "[P]rison officials inevitably will err on the side of too little freedom."

press interviews with inmates) and *Procunier* v. *Martinez* (1974) 416 U.S. 396 [40 L.Ed.2d 224, 94 S.Ct. 1800] (ban on paralegals and law students as interviewers of inmate clients). Both evaluate the constitutionality of restrictions by balancing individual rights against "the legitimate interests of penal administration." (*Martinez, supra,* at p. 420 [40 L.Ed.2d at p. 244]; see also *Pell, supra,* at p. 822 [41 L.Ed.2d at p. 501].) They list as "legitimate interests" security, rehabilitation, deterrence, internal order, and discipline. The availability of any less restrictive alternative to accomplish the goals weighs against the regulation. As for deference to prison officials, *Martinez* places in balance "the proper regard that judges should give to the expertise and discretionary authority of correctional officials" (*Martinez, supra,* at p. 420 [40 L.Ed.2d at p. 244]). *Pell* states that, if substantial evidence does not indicate an exaggerated response by the officials, courts should defer to their expert judgment in serving the policies and goals of penal administration. (*Pell, supra,* at p. 827 [41 L.Ed.2d at p. 504].)

The concurring opinions in *Martinez* pronounce as their approach that inmates generally retain the same rights as nonimprisoned citizens. (*Procunier* v. *Martinez, supra,* 416 U.S. at pp. 428 (Douglas, J.) and 422 (Marshall, J.) [40 L.Ed.2d at pp. 248, 245].) Section 2600 seems clearly to articulate that approach.

Some federal cases posit that prisoners come to court with fewer rights than free people. "[I]ncarceration brings about the necessary withdrawal or limitation of many . . . rights, a retraction justified by the considerations underlying our penal system." (*Price* v. *Johnston* (1948) 334 U.S. 266, 285 [92 L.Ed. 1356, 1369, 68 S.Ct. 1049].) "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner." (*Pell* v. *Procunier, supra,* 417 U.S. at p. 822 [41 L.Ed.2d at p. 501].) Those words were quoted in *Jones* as support for the conclusion that courts should defer to the judgment of officials who are expert in the "complex realities" of administering a prison. The words also may support respondent's assertion that "[p]ersons incarcerated in prison are, by definition, deprived of certain constitutional rights." Such comments are, though, contrary to the words of section 2600.

In California the Legislature has created a powerful guarantee of prisoners' rights. While reasonable restrictions may necessarily differ in nature and severity from those outside prisons, all rights are retained by prisoners except in the specific conditions provided by the statute. We

should therefore require that prison officials make an affirmative showing that the statute permits their depriving prisoners of any right. We should not defer, as did the court in *Jones,* to the unsubstantiated "expert judgment," "informed discretion," and "reasonable belief" of the administrators. Section 2600's declaration of prisoners' rights does not permit deprivations on such bases.

This court's opinions on the 1968 version of section 2600 provide some guidance as to the required showing. *Harrell, supra,* 2 Cal.3d 675 held that if a rule significantly impedes a prisoner's right the burden of justification is on the prison officials. (*Id.,* at p. 687.) "Remote and wholly speculative" predictions of security problems are not sufficient. (*In re Jordan, supra,* 12 Cal.3d 575, 579; *In re Jordan, supra,* 7 Cal.3d 930, 937.) Deprivations are not justified if there is no evidence that the claimed risk "is more than miniscule" (*In re Jordan, supra,* 7 Cal.3d at p. 938) or if there is no evidence of past security problems related to the risk. (*Id.*) The practices of other prison systems may be relevant. (*Id.,* at p. 937.) Officials should show that there is no reasonably less-restrictive method for handling the risk. (*Id.,* at p. 938.)

Respondent here has relied mainly on his and other prison officials' opinions, conclusions, and speculations. He has not shown that the predictions of security risks in permitting meetings are supported in fact. He has not shown that his opposition to one Union objective requires that he prohibit discussion of that and all the other objectives. Nor, indeed, has he shown reasonable security grounds for prohibiting inmates from pursuing organized inmate-initiated prison reform and negotiation, which may well be a more efficient and effective means of securing needed reforms than are repeated court battles.

I would hold that on the basis of the record here respondent may not continue his absolute ban on Prisoners Union meetings. Bearing in mind that prisoners may be deprived of their rights only as section 2600 permits, he may of course impose reasonable restrictions on time, place, and manner. "Section 2600 cannot be construed as a straightjacket limiting the ability of prison authorities to deal with institutional realities." (*In re Harrell, supra,* 2 Cal.3d 675, 698.) Monitoring, careful searching, and limits on the number of authorized groups and on numbers of outside participants are examples of conceivably reasonable regulations. If for any reason an actual security threat does develop,

respondent has discretion to take necessary action such as discipline, suspension, or even banning.

Respondent should be directed to cease enforcing his ban on Union meetings.

Bird, C. J., and Tobriner, J., concurred.