[Crim. No. 37173. Second Dist., Div. Three. Dec. 4, 1980.]

In re JAMES ODRA SMITH et al., on Habeas Corpus.

[Crim. No. 37792. Second Dist., Div. Three. Dec. 4, 1980.]

In re JOHNNY CLARK RUSSELL on Habeas Corpus.

**COUNSEL**

Terry Smerling, Fred Okrand, Mark D. Rosenbaum, Scovis & Scovis and Jenny Scovis for Petitioners.

Dorothy L. Schechter, County Counsel, and Gary Byron Roach, Assistant County Counsel, for Respondent.

OPINION

KLEIN, P. J.—

STATEMENT OF THE CASE

Petitioners James Odra Smith (Smith), Richard William Brown (Brown) and Johnny Clark Russell (Russell) (collectively referred to as petitioners) seek a writ of mandate to compel the Sheriff of Ventura County to allow child visitation and receipt of reading materials from sources other than publishers in branch facilities of the Ventura County jail. Russell's petition was consolidated with that of Brown and Smith for purposes of disposition.

FACTS[1]

Petitioners are pretrial detainees, persons confined while awaiting trial because they cannot post bail.[2]

Twenty percent of the pretrial detainees at the Oxnard facility of the Ventura County jail remain in custody for more than 90 days. Seven percent of the pretrial detainees at the Oxnard facility of the Ventura County jail remain in custody for more than 90 days. Seven percent of the pretrial detainees at the Ojai Honor Farm branch facility stay in custody in excess of 90 days. Using a one-year base period of May 1, 1979, to April 30, 1980, the percentage and number of pretrial detainees in custody at the Ojai Honor Farm was: more than 60 days but less than 90 days—8 percent or 22, and more than 90 days—7 percent or 20.

Using a 13-month base period of April 1, 1979, to April 30, 1980, the percentage and number of pretrial detainees at the Oxnard branch was: more than 60 days but less than 90 days—10 percent or 33, and more than 90 days—21 percent or 68.

Substantially larger numbers remain for periods of time less than 60 days.

---

[1] These facts were adduced at an evidentiary hearing on questions which were submitted to the superior court through an order for reference.

[2] In connection with this matter, we have information relating only to pretrial detainees housed at the Oxnard branch jail and the Ojai Honor Farm facilities of the Ventura County jail.

*Availability of Reading Material*

The so-called "publisher only" rule is in effect at all Ventura County jail facilities. Under this regulation, pretrial detainees may receive publications accepted for distribution through the United States mail directly from a publisher or other recognized distributor, but not from family or friends. The justification for the rule is the maintenance of jail security, not censorship.

According to expert testimony, books, magazines and newspapers are a significant source of contraband if they are not thoroughly inspected before entering the jail. While hardcover books which may conceal all types of drugs and weapons pose the greatest security threat, drugs and more delicate weapons and escape devices, such as wires and small jewelers' saws may be secreted in paperback books, magazines and newspapers. The only means of adequately examining these publications for contraband is to go through them page by page. Publications coming directly from publishers or other recognized sources are far less likely to contain such contraband and therefore do not require such careful scrutiny.

In addition to the publications which may be obtained through publishers, there are from 10,000 to 15,000 paperback books in numerous subject categories[3] available to pretrial detainees. Each branch jail also has a small library facility of its own.[4] There are 1,000-2,000 books at the Ojai Honor Farm and 500-1,000 books available at the Oxnard branch. Additionally, approximately once a week a library cart is circulated among the pretrial detainees at the Ojai Honor Farm, and 12-30 books are available in the dormitories themselves.

Over 90 percent of the books in the Ventura County jail's library system have been donated. The public may donate books and magazines by delivering the publications to the main jail. These donated publications are then screened by jail personnel as time permits and put into general circulation for use by all inmates.

---

[3]These subject categories include fiction, nonfiction, historical novels, romances, biographies, religion, science fiction, humor and health.

[4]In order to request a book through the library system, a pretrial detainee puts his name, booking number and location on a request form, called a "kite," and presents it to jail personnel. The book will then be delivered to him the next day if it is available. Books may also be requested from the jail chaplain who visits each facility at weekly intervals.

## Child Visitation

The general policy of the branch facilities of the Ventura County jail is not to allow minor children to visit inmates. The reason behind the policy is jail security, in that when the facilities were constructed many years ago, no consideration was given to accommodating child visitations. As a consequence of the structural limitations and limited security staff, control of the activities of minors is difficult, which control is necessary as children, wittingly or unwittingly, constitute a source of contraband into the facility, create diversions, and are disruptive.[5]

There have been a few exceptions to the policy. The primary consideration for allowing child visitation is some sort of "unusual psychological hardship" occasioned either to the inmate or the child. Additional criteria include the "needs and benefits to the inmate, his own mental or psychological well-being, the child, its psychological well-being,..."; and insuring the inmate's relationship with his family unit.

If a request were to be made for child visitation, the decision would rest solely with the commander in charge of the operation and administration of the county jail system, based upon "the uniqueness of the specific situation, [and] permission would be granted or denied on an individual case-by-case basis."

Only three such child visitations have ever been arranged, and all of them occurred within the last year. One involved petitioner Smith, who had been in continuous confinement in excess of three years. Another involved inmate Cowans, who likewise had been confined for a period of over two years; and the third involved an inmate who was a former attorney and the parent of a mentally impaired child.

Both facilities accomodate adult visitors on a regular basis. No child visitations have taken place at the Oxnard facility.

At the Ojai Honor Farm, the primary visiting area is the common dining room, wherein inmates sit at the dining table across from visitors, separated only by low wooden barriers.

[5]Ventura County plans to open a new facility to house all pretrial detainees in February 1981. Reasonable child visitation is to be permitted at the new facility.

The problem precluding child visitations in this area is that there are a number of "blind spots" where children, "because of their actual height or what have you, would be free to bring in and secrete contraband."

There are two additional special visiting rooms, one in the administrative segregation section and the other in the discipline segregation unit. As to the use of these rooms for such visits, there are areas where children could be temporarily out of view of the control room, and they could therefore drop or secrete contraband.

The facility also has a special secure visitation booth with telephones on both sides of the wall and glass which is used when it is deemed necessary to maintain security between visitor and inmate.

One other room is available for visitation. It has a collapsible, corrugated divider which when used allows the one room to become two rooms. These rooms are sometimes used to accommodate attorney-inmate interviews.

It was in one of these rooms, room number 1, that the three child visitations took place. The problem with child visitations therein is that unless the children stay on one side exactly where instructed to do so, they would be obscured from the view of the officers in the control room.

Because child visitations are handled on a one-on-one basis, the jail administration sets up a secure environment. The visitations were arranged by appointment to allow for any adjustments of schedules to insure the availability of sufficient security "without significantly negatively impacting" the necessary routines of the "extremely limited staff."

When asked what particular risks to jail security child visitations would pose, the commander-in-charge responded that children do not fear reprisal and are nonresponsive to oral and written rules and regulations; that they can be directed to rush past security personnel, and to secrete, carry and transfer contraband. Further, that because of their inquisitive nature, children could create diversions which would drain off limited security staff to the detriment of the security program of the institution.

The commander noted that pretrial detainees are free to communicate with their minor children through the mail and by telephone. However, telephone requests require staff approval and are "infrequently" granted.[6]

## CONTENTIONS

Petitioners contend, inter alia, that (1) the publisher only rule violates their right of freedom of expression under the United States and California Constitutions and denies them equal protection of the law; and (2) the policy which effectively prohibits visitation by their minor children violates their constitutional rights of expression, association and privacy.

## DISPOSITION

For the reasons set forth below, we find petitioners' first contention to be without merit as the publisher only rule is a reasonable means of maintaining jail security.

However, we conclude that their second contention is meritorious in that the policy effectively preventing visitation of minor children is unconstitutional because such policy unreasonably interferes with petitioners' constitutional rights of association and privacy. We therefore order that a peremptory writ of mandate issue as to the latter contention.

## DISCUSSION

The framework for analysis of petitioners' contentions is dictated by the United States Supreme Court's recent decision in *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861]. There, the court reversed a decision of the Second Circuit which had held that restrictions placed on pretrial detainees must be justified by the standard of "compelling necessities" of jail administration. (*Wolfish* v. *Levi* (2d Cir. 1978) 573 F.2d 118.) The Supreme Court, in holding that the test by which restrictions must be scrutinized is not "compelling necessities" but "punishment," states: "In evaluating the constitutionality of

---

[6] It was the commander's belief that child visitations were allowed in the Los Angeles County jail and the California prison system, and he thought that the Orange and Santa Barbara County jails accommodated such visits.

We take judicial notice that in fact child visitations are allowed in the California prison system, and in the jails of Los Angeles County, Orange County, San Diego County, and San Francisco. (Evid. Code, §§ 452, subds. (b), (c), and 200.)

conditions or restrictions of pretrial detention..., we think that the proper inquiry is whether those conditions amount to punishment of the detainee.... Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' [Citations.] Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. [Citation.]...Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial...[T]he effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." (Fns. omitted.) *Bell* v. *Wolfish, supra,* 441 U.S. 520, at pp. 535, 538-540 [60 L.Ed.2d 447 at pp. 467-469].)

In addressing a contention similar to the one raised by petitioners herein, namely, that the sheriff's policy prohibiting their receipt of reading material from nonpublisher sources outside of the jail violates their constitutional right of freedom of expression, the Supreme Court in *Bell* v. *Wolfish, supra,* at pages 550-551 [60 L.Ed.2d at pages 475-477], held: "We conclude that a prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate the First Amendment rights of...inmates. That limited restriction is a rational response by prison officials to an obvious security problem...and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources."

The court went on to observe that its "conclusion that this limited restriction...does not infringe the First Amendment rights of...inmates is influenced by several other factors. The rule operates in a neutral fashion, without regard to the content of the expression. [Cita-

tion.] And there are alternative means of obtaining reading material that have not been shown to be burdensome or insufficient." (*Id.*, at p. 551 [60 L.Ed.2d at pp. 476-477].)

Regulations requiring that publications come from approved sources have been previously upheld against constitutional attack on the ground that "they insure against the importation of contraband into the prison." (*In re van Geldern* (1971) 14 Cal.App.3d 838, 844 [92 Cal.Rptr. 592]; *In re Harrell* (1970) 2 Cal.3d 675, 698 [87 Cal.Rptr. 504, 470 P.2d 640].)

■ Applying these principles to the case before us, we note that while the publisher only rule at the Ventura County jail facilities precludes pretrial detainees from also receiving softbound books or magazines directly from family or friends contrary to the fact situation in *Bell* v. *Wolfish, supra*, at page 549 [60 L.Ed.2d at p. 475], there are a substantial number of publications available to the detainees through the jail library system. Moreover, if a detainee desires a particular publication which is not in the jail library and he is unable to obtain it from an approved source, his family or friends may donate the publication to the jail library for use by all of the detainees in the facility.

The regulation herein, which does not purport to censor reading material, appears to be a "reasonable and proper" means of maintaining security at the jail.

■ Petitioners' further contention that the publisher only regulation is based upon wealth in violation of the equal protection clause of article I, section 7, of the California Constitution, since it applies only to those detainees who are unable to raise bail, is not persuasive, and is an issue which has been addressed by our courts. "[A]t common law bail was not a matter of right but a matter the granting or denial of which rested within the sound discretion of the court. (*Carlson* v. *Landon* [1952] 342 U.S. 524, 545-546...; *In re Underwood* [1973] 9 Cal.3d 345, 349....) It is not a right under the United States Constitution since the Eighth Amendment only provides that excessive bail shall not be required in those cases where it is proper. (*Carlson* v. *Landon, supra; In re Underwood, supra.*) In California our Constitution not only provides that bail not be excessive but also that persons shall be bailable by sufficient sureties except in capital cases. (Art. I, § [12].)...Both the federal and the California Constitution countenance that bail may be required in a proper case and neither make or

authorize any distinction between a person financially able to raise such bail and one who is not able to do so because of his indigence." (*People v. Gilliam* (1974) 41 Cal.App.3d 181, 191 [116 Cal.Rptr. 317].)[7]

Nor does the fact that the publisher only rule is not present in the state prison system work to deny petitioners equal protection of law. ■ "The conditions of confinement of pretrial detainees in a jail could violate the equal protection clause of the Fourteenth Amendment if, without adequate justification, they are more restrictive than the conditions of confinement of convicted prisoners in a penitentiary. However, differences in the conditions of the two institutions would not, on their face, be sufficient to establish a constitutional violation, since such differences might be attributable to the distinct nature and functions of the two institutions. [Citation.]" (Fn. omitted.) (*Campbell v. McGruder* (1978 D.C. Cir.) 580 F.2d 521, 532-533; see *Rhem v. Malcolm* (1974 2d Cir.) 507 F.2d 333, 338.)

■ As there is no evidence in the record which demonstrates that the Ventura County jail and the state penal institutions are similarly situated and, as such, that the reason for this variation in policy is not due to inherent functional differences between them, we do not find that the instant regulation violates the principle of equal protection.[8]

Petitioners' contention that the sheriff's policy of effectively prohibiting visitation of minor children with their incarcerated parents violates their constitutional rights of expression, association and privacy

---

[7]While we are cognizant that the "'bail system...frequently works an injustice on those who cannot afford to post a bail bond...'" (*Van Atta v. Scott* (1980) 27 Cal.3d 424, 453 [166 Cal.Rptr. 149, 613 P.2d 210]), we do not find that the inability to make bail per se constitutes a denial of equal protection. In *Van Atta v. Scott, supra*, the court held on procedural due process grounds that the prosecution must bear the burden of proof concerning a defendant's ineligibility for an OR release.

[8]Petitioners also argue that the regulation involved herein constitutes an unreasonable restraint under Penal Code section 688, which provides: "No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge." This section has repeatedly been construed as pertaining to physical restraints in courtrooms rather than any "restraint" involved in jail regulations such as the instant publishers only rule. (See, e.g., *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People v. Earl* (1973) 29 Cal.App.3d 894, 900-901 [105 Cal.Rptr. 831], disapproved on other grounds in *People v. Duran, supra*, at p. 292 [105 Cal.Rptr. 831]; *People v. Pena* (1972) 25 Cal.App.3d 414, 424-425 [101 Cal.Rptr. 804], disapproved on other grounds in *People v. Duran, supra*, at p. 292.) The legislative history of the section does not suggest a contrary interpretation. (See, e.g., 7 Cal. Law Revision Com. Rep. (1965) p. 364.)

presents a closer and more difficult "judgment call." In our function as a reviewing court, *Bell* v. *Wolfish, supra,* 441 U.S. 520, mandates that we must defer to the expertise of corrections officials. The opinion clearly states: "...Prison administrators...should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' *Pell* v. *Procunier* [1974] 417 U.S. [817,] 827...." (Fns. omitted.) (*Id.*, at pp. 547-548 [60 L.Ed.2d at p. 474].)

Since courts must defer to jail administrators unless there is substantial evidence in the record to question their judgment, petitioners seeking to challenge restrictions imposed by said administrators face a heavy burden. In ascertaining whether petitioners have met their burden, a reviewing court must determine whether a particular restriction is reasonably related to a legitimate governmental objective, or whether the restriction in question is arbitrary, or excessive, or an exaggerated response to a legitimate goal of the institution.

Our task is all the more exacting when the restriction is justified on the grounds of institutional security because almost *any* condition or restriction could be condoned by jailers for that legitimate goal. Utilizing the maxim of logic "reductio ad absurdum" to counteract such arguments, we cite the example of confining each prisoner in a five feet by seven feet windowless cell twenty-four hours a day to insure security. Obviously, no court would find so barbaric a restriction on personal liberty other than excessive. Less obvious but certainly questionable is a restriction banning child visitations for the reason that such visits interfere with the maintenance of jail security.

 The relationship between parent and child is so basic to the human equation as to be considered a fundamental right, and that relationship should be recognized and protected by all of society, no less jailers. (See *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208]; *Van Atta* v. *Scott, supra,* 27 Cal.3d 424, 436.) Interference with that right should only be justified by some com-

pelling necessity, i.e., a parent dangerously abusing a child. Separating parent and child for long periods of time in the good faith claim of maintaining jail security is a denial of the rights between parent and child and a denial of the constitutional rights of association and privacy.

Jailers must provide pretrial detainees with housing, food, clothing, and certain other necessities in such a fashion that inmates are not "punished" during their incarceration. It is not within the purview of jail administrators to deny equally basic child visitation rights in carrying out their function. Such a response in the interests of security is arbitrary and excessive. Jail authorities should limit their response to formulating rules and regulations that will reasonably insure safe and secure child visitations.

Nor should jail officials be in a position to decide which inmates will see their children in a limited child visitation program, that decision to be determined on some arbitrary standard of "mental or psychological" need of inmate and/or child. To arrogate such a sensitive determination to one's self, even as a trained jail administrator, is grossly presumptive, and indeed an exaggerated response to a matter which does not properly lie with custodial authorities.

We believe we are upholding the principles of *Bell* v. *Wolfish, supra,* 441 U.S. 520, in concluding that the ban on child visitation is an excessive response to the limited risk presented by child visitation in these particular facilities, and therefore not reasonably related to a legitimate governmental objective, influenced as we are by the fundamental nature of the rights between parent and child and the interest of the state in maintaining that delicate relationship. (See *Stanley* v. *Illinois, supra,* 405 U.S. at p. 651 [31 L.Ed.2d at pp. 558-559]; Cf. the persuasive rationale in *Valentine* v. *Englehardt* (D.N.J. 1979) 474 F.Supp. 294.)

Let a peremptory writ of mandate issue directing the Ventura County Sheriff to promulgate policies allowing reasonable child visitation in accordance with the views expressed herein.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied December 24, 1980, and petitioners' application for a hearing by the Supreme Court was denied February 5, 1981. Bird, C. J., and Newman, J., were of the opinion that the application should be granted.