[Crim. No. 21978. Feb. 18, 1982.]

In re RAY CUMMINGS on Habeas Corpus.

COUNSEL

Michael Satris and Donald Specter, under appointments by the Supreme Court, Kelley Burg and Charles Bishop for Petitioner.

Quin Denvir, State Public Defender, and Harvey R. Zall, Deputy State Public Defender, as Amici Curiae on behalf of Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien and William D. Stein, Assistant Attorneys General, Gloria F. DeHart, John T. Murphy, Thomas A. Brady and Karl S. Mayer, Deputy Attorneys General, for Respondent.

OPINION

**RICHARDSON, J.**—The Department of Corrections (Department) has adopted regulations which allow certain prisoners overnight visitation with their "immediate family." Such visitation usually occurs in a guarded mobilehome, extends for two or three days, and includes the exercise of conjugal rights. Petitioner challenges as arbitrary and unreasonable the Department's eligibility restrictions but we uphold its action.

The regulations at issue direct prison wardens and superintendents to adopt a family visitation plan available "to as many inmates as is possible commensurate with institution security .... Each institution will provide all necessary accommodations ... to permit extended and overnight visitation between eligible inmates and members of the inmate's immediate family ...." (Cal. Admin. Code, tit. 15, § 3174.) "Immedi-

ate family members" are defined as including "legal spouse," and "natural" or "adoptive" children, as well as parents, grandparents, grandchildren, brothers and sisters, and other specified classes of persons related to the inmate by blood, marriage or adoption. (*Ibid.*) Finally, the regulations provide that "Persons with only a common-law relationship to the inmate will not be recognized as immediate family members for the purpose of family visiting." (*Ibid.*)

Petitioner, a San Quentin inmate serving a sentence of life imprisonment for first degree murder, was denied family visitation with Susan C. and her daughter, S. According to petitioner, he had lived in a "family relationship" with Susan and S. from 1971 until his arrest in 1978. He admits that he is not legally married to Susan, that S. is not his natural or adopted child, and that he is married to another woman and Susan is married to another man. Nevertheless, he insists that he should have been permitted family visitation with Susan and S. because of "a bona fide long-standing family relationship with [them] . . . based on the long-standing and mutual emotional, psychological and financial commitment they have to each other." According to petitioner, his relationship with them has continued since his incarceration, through the exchange of letters and daytime prison visits.

When prison officials denied petitioner family visitation, petitioner brought the present habeas action seeking to invalidate the Department's regulations and to compel prison officials to extend to him these privileges.

Penal Code section 2600, enacted in 1975, provides that a prisoner "may . . . be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." Among the "rights" to which prisoners are ordinarily entitled is the right "To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution." (Pen. Code, § 2601, subd. (d).)

We have previously acknowledged, however, that the foregoing provisions cannot "'be construed as a straitjacket limiting the ability of the prison authorities to deal with institutional realities.' [Citation.] Valid and compelling institutional considerations may necessitate certain limited inroads upon the exercise of the prisoner's civil rights." (*In re van Geldern* (1971) 5 Cal.3d 832, 837 [97 Cal.Rptr. 698, 489 P.2d

578].) As we recently observed, restrictions upon an inmate's associational rights are an inevitable product of his confinement: "Manifestly, one of the basic rights enjoyed by all free citizens, *and necessarily denied to prisoners*, is the right of association. *By the very nature of imprisonment prisoners are separated from their families*, their friends, and their business or social associates.... No legislative intent indicates, and no case law holds, that such restrictions on the right of association are invalid." (*In re Price* (1979) 25 Cal.3d 448, 452-453 [158 Cal.Rptr. 873, 600 P.2d 1330], italics added [no right to hold union meetings in prison].)

In this regard, the right-of-privacy cases relied on by petitioner (e.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779], and *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436]) are inapposite, for they concern the personal or privacy rights of nonprisoners. Rights of privacy, like associational rights, are necessarily and substantially abridged in a prison setting.

As *In re Price, supra*, 25 Cal.3d 448, further holds, we must attempt to determine whether the challenged regulation before us is "reasonable" and consistent with legitimate state interests. (P. 453.) We conclude that it is. Here, the department's regulation excludes family visitation by persons having only a "common-law relationship" with the inmate, that is, persons unrelated to him by marriage, blood or adoption. The program's social purpose of preserving family unity would not be served by encouraging inmates' overnight visits with those who are not in his family. Contrary to petitioner's contention, the regulation is not "arbitrary" but reasonable. The prolonged personal and intimate contact afforded prisoners is limited to those persons with whom the prisoner has a readily provable, legally cognizable, traditional family relationship. If, as is clear, prison officials may ban overnight visits with inmates altogether, then certainly they may limit those visits to persons with whom the inmate has a bona fide relationship established through blood, marriage or adoption. To recognize other "alternative" relationships as justifying "family" visitation is an invitation into semantic quicksand. Moreover, it would encourage subterfuge.

The opportunities for abuse of the family visitation privilege are obvious, and repeated abuses might well lead authorities to terminate the entire family visitation program, which is within their power. Such a consequence would represent a sad loss both to inmates and family

members, bonded by legally recognized ties, who benefit from a generally laudable and humane attempt to preserve those ties during incarceration.

In the present case, for example, petitioner seeks overnight visitation with persons with whom he assertedly has had "a bona fide long-standing family relationship." Yet without the benefit of marriage, birth or adoption certificates, how are prison authorities to verify the truth of petitioner's assertion? Certainly, a prolonged administrative hearing should not be required in each of these cases, and yet it is equally evident that prison authorities need not accept as true petitioner's characterization of the relationship.

As we see it, there are two families here: Petitioner is in one. Susan and her daughter are in another. That may change, but it hasn't yet. Until it does, the relationship between petitioner and Susan is not that of a "family." It is something else.

Beyond the foregoing practical considerations, we discern no valid public policy requiring California's taxpayers to provide overnight housing accommodations and security supervision for a prison inmate with his or her paramour. In our view, such a program would represent both social folly and fiscal extravagance at a time when penal funds are much needed for more critical purposes; certainly, such a plan is not legally compelled.

Finally, we note from the record that petitioner is serving a life sentence for first degree murder. Susan herself has a criminal record. The potential volatility of such a situation is obvious.

Thus, we conclude that in the absence of a valid, provable family relationship based upon blood, marriage or adoption, prison officials are fully justified in denying extended overnight visitation.

The order to show cause previously issued herein is discharged and the petition for habeas corpus is denied.

Mosk, J., and Kaus, J., concurred.

BIRD, C. J.—I concur in the result reached in the opinion by my colleague, Justice Richardson. However, I cannot join his reasoning.

A prisoner in California can be deprived of only those rights that are necessary to protect the safety of the prison or the public. (Pen. Code, § 2600.) In keeping with this statutory guarantee, the California Administrative Code commands that each institution extend overnight visitation "to as many inmates as is possible commensurate with institution security." (Cal. Admin. Code, tit. 15, § 3174.)

The definition of a "family" in our society has undergone some change in recent years. It has come to mean something far broader than only those individuals who are united by formal marriage. Many individuals are united by ties as strong as those that unite traditional blood, marriage and adoptive families.

However, the very diversity of the groups of people now commonly referred to as "families" highlights the difficulty that would be created if the prison authorities were required to grant family visits to prisoners who were not married. The prison authorities do have a security interest in prohibiting visits by transients, whose ties to the prisoners may be fleeting or tenuous at best. In the absence of a marriage certificate or a valid out-of-state common law marriage, it would be extremely difficult for prison officials to distinguish between the valid long-term commitments that constitute a "family" and transient relationships. Further, the evidentiary hearings that such determinations would require would pose a significant administrative burden on prison officials.

In my view, the regulation here challenged is necessary to avoid long and numerous administrative hearings into the question of whether the prisoner has an ongoing family relationship outside the confines of an easily ascertainable marriage relationship. Even more troubling are the moral judgments that prison administrators (representatives of the state) would be required to make in these hearings.

In the absence of any reasonable alternative to distinguish between families and nonfamilies, the limitation of family visits to those who are married under the laws of this or another state is a valid restriction.

Broussard, J., concurred.

NEWMAN, J., Dissenting.—The majority conclude: "[T]here are two families here: Petitioner is in one. Susan and her daughter are in another. That may change, but it hasn't yet. Until it does, the relationship between petitioner and Susan is not that of a 'family.'" (*Ante*, p. 874.)

The record does not tell us who are "in" petitioner's family under that interpretation. Yet it does tell us that petitioner, Susan, and her daughter apparently lived together from 1971 until his arrest in 1978, that the daughter "has lived with [him] *since her birth and regards him as her father*" (italics added), and that the three enjoy "a bona fide long-standing family relationship with each other ... based on the long-standing and mutual emotional, psychological and financial commitment they have to each other ...." It seems likely that in the 1980's many readers will be astonished to learn that that daughter and her mother are to be treated as having no family relationship with petitioner.[1] (Cf. dis. opn. in *Steed v. Imperial Airlines* (1974) 12 Cal.3d 115, 126, 130 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204]: "... Elizabeth was the child of the decedent in every sense but biological ..."; and re child visitation generally see *In re Smith* (1980) 112 Cal.App.3d 956, 967-969 [169 Cal.Rptr. 564].)

Whom under the pertinent regulation here do prison officials treat as "immediate family members"? They include, quite extensively:

| | |
|---|---|
| legal spouse, | brothers and sisters, |
| natural parents, | natural children, |
| step-parents, | adoptive children, |
| foster parents, | step-children, |
| grandparents, | grandchildren, *and also* |

"adoptive parents, if the adoption occurred *and a family relationship existed* prior to the inmate's incarceration" ([Cal. Admin. Code, tit. 15] § 3174, subd. (a); italics added). Further: "When a bonafide and verified foster relationship exists between an inmate and another person, by

---

[1] "[A]t least one of every six American babies is born to an unwed mother, new government figures show. [¶] Well over half—55 percent—of all black babies in 1979 were born to unwed mothers. Yet the increase in out-of-wedlock births among teenagers is significantly greater for whites than blacks, according to federal Census and health statistics." (A.P. dispatch from Washington, S.F. Chronicle, Oct. 26, 1981, p. 4.) "For the first time, married couples make up fewer than three American households out of five, according to new Census Bureau statistics released yesterday." (*Ibid.*, Nov. 16, 1981, p. 5.)

Cf. U.P. dispatch from Washington, *A Revealing Census On Marriage, Divorce*, S.F. Chronicle, October 19, 1981, page 8: "The number of unmarried couples tripled between 1970 and 1980, ... rising from 523,000 to 1,560,000 .... [F]or every 10 persons in 1980 who were in an intact marriage, there was one person who was divorced and had not remarried .... Half of the women and two-thirds of the men aged 20 to 24 had not married in 1980, up from 36 percent of the women and 55 percent of the men in 1970. [¶] One of every five children ... lived with only one parent."

virtue of being raised in the same foster family, the person may be approved for family visiting with the prior approval of the warden or superintendent." (Subd. (b).)

Those last two quotations should be read with care. They are significant because they authorize prison officials to decide whether an extended "family relationship existed" and whether "a bonafide ... foster relationship exists." Subdivision (c) of the regulation, at issue here, similarly authorizes officials to decide whether "only a common-law relationship to the inmate" existed or exists. So far as we can tell from the record, the Department has not yet issued any official interpretation of its phrase "common-law relationship."

Has the Legislature authorized the Department to exclude members of a stable, alternative family (albeit with "only a common-law relationship") from a program that seemingly benefits all members of traditional and extended families—including "adoptive parents, if the adoption occurred and a family relationship existed prior to the inmate's incarceration" *and also* "[a]unts, uncles and cousins [when] a bonafide foster relationship exists" (subd. (a), last sentence)?

Penal Code section 2600, enacted in 1975, provides a prisoner may " ... be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." There is no suggestion here that denial of petitioner's request for family visits is "necessary to provide for the reasonable security of the institution ... and for the reasonable protection of the public."

Has he been deprived of a right? It may be that neither constitutional nor other law gives all prisoners a right to family visitation. When officials grant that right to *some* prisoners, however, Penal Code section 2600 evidences a legislative determination that other prisoners should not arbitrarily be excluded from the program.

To illustrate: Is it not clear that family visits are not to be denied on the ground that an inmate during a visit insists on wearing certain lapel buttons or wants to read and write nonprohibitable correspondence? (Cf. *In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86]; *In re Brandt* (1979) 25 Cal.3d 136 [157 Cal.Rptr. 894, 599 P.2d 89].) Rules articulating that kind of restriction would be arbitrary and thus contrary to the aims of section 2600.

Further, we recently reminded state officials that "... California courts have repeatedly rejected the argument that because the state is not obligated to provide a general benefit, it may confer such a benefit on a selective basis which excludes certain recipients solely because they seek to exercise a constitutional right." (*Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 264 [172 Cal.Rptr. 866, 625 P.2d 779].) The Department of Corrections for several years has accorded the benefits of overnight visiting to the members of traditional and extended families. At the same time may the Department withhold those benefits from members of alternative families—families, that is, who show (using the Department's own words) "only a common-law relationship"?

In *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436] this court concluded that the city failed to justify its decision to restrict communal living. (*Id.*, at pp. 131-134.) With respect to how many people may reside in one house we held invalid "the distinction effected by the ordinance between (1) an individual or two or more persons related by blood, marriage, or adoption, and (2) groups of more than five other persons." (*Id.*, p. 134.)

For analogous reasons, and again relying on the guarantee of "privacy" proclaimed in section 1 of article I of the California Constitution, we should hold invalid the distinction effected by section 3174, subdivision (c) of the regulations here between (*A*) the "immediate family members" identified in subdivision (a) and individuals among whom "a family relationship existed prior to the inmate's incarceration" (the Department's words), on the one hand, and (*B*) those who can show "only a common-law relationship" on the other.

The Attorney General suggests that the Director of Corrections has sensed "a correlation between maintenance of family ties by state prisoners and law abiding conduct after release from prison"; also, that "[t]he purpose of family visiting is to maintain and nourish ties between inmates and their families outside of prison, and thereby to enhance the likelihood of success on parole." We have searched in vain for evidence that such goals are furthered when families are traditional or extended but not when they are alternative.

The disposition proposed in this opinion would not, of course, effectuate the Attorney General's dire forecast that the Department will have to provide for "combinations of unrelated visitors ... including one or

more girlfriends, one or more boyfriends, combinations of girlfriends and boyfriends, overnight visits with lawyers, investigators, and various combinations of any of the above . . . ." Nor does the record support the majority's conclusion that, with respect to alternative families as contrasted with traditional and extended families, "opportunities for abuse . . . are obvious, and repeated abuses might well lead authorities to terminate the entire family visitation program . . . ." (*Ante*, p. 873.)

On the limited record before us we should not rule that in fact the petitioner is entitled to enjoy family visits. Nonetheless our denial of the petition for habeas corpus should be without prejudice to further requests for visits and administrative action not inconsistent with this opinion.

Tobriner, J.,* concurred.

Petitioner's application for a rehearing was denied April 15, 1982.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.