OPINION OF THE COURT
Dakota D. Ramseur, J.
Petitioner father E.A., an inmate at Eastern State Correctional Facility (the prison), commenced this proceeding against respondent mother R.A. for visitation of their son, the subject child, an eight year old with autism. Petitioner argues, in sum and substance, that his incarceration alone does not rebut the traditional presumption that visitation is in the child’s best interests. After a trial held on July 6, 2016, September 22, 2016, and December 12, 2016,[2] this court holds that, at this juncture, respondent has successfully rebutted the presumption of visitation and denies the petition.
Background Facts[3]
A. Petitioner’s Testimony
Petitioner and respondent lived together in a studio/one-bedroom apartment in the Bronx in September of 2008 when the child was born. Petitioner and respondent stayed together for approximately three months thereafter, at which time petitioner moved in with his mother. Though petitioner initially maintained contact with his son, including visitation on weekends, their relationship “started fading” (trl at 7, lines 9-18).
Petitioner filed two prior custody petitions on March 11, 2009 and March 23, 2010 (trl at 11, lines 3-7). Though both were dismissed without prejudice (id.), petitioner testified that they prompted respondent to allow visitation on Sundays, petitioner’s day off (trl at 12, line 15 through 15, line 3). On those visits, petitioner would pick up the subject child, then two *1069 years old, at respondent’s home, then drop him off at respondent’s mother’s home (id.). These visits continued until approximately one week before petitioner’s incarceration in June of 2011, which stems from his murder of the three-year-old child of an ex-girlfriend (trl at 7, line 24 through 8, line 13; at 33, lines 18-24).
Petitioner has not seen the subject child, now eight years old, since his incarceration (trl at 35, lines 8-16; at 44, line 16 through 47, line 12), despite the availability of visitation programs on weekends (trl at 20, line 1 through 21, line 23; at 29, line 20 through 32, line 3), a dedicated visitation area, and outdoor facilities in summer (trl at 25, lines 1-25). Asked to elaborate upon the visitation area, petitioner described an area measuring approximately 30 feet by 30 feet with a linoleum floor, metal doors, and several tables supervised by correctional officers (trl at 54, line 2 through 60, line 1). Petitioner did not know whether visitors would be strip searched, and was unable to provide details about the children’s area (id.). Petitioner has not yet completed any parenting skills or anger management classes, but has joined the waiting list for both (trl at 28, line 1 through 29, line 10).
On cross-examination by respondent, petitioner admitted that since his incarceration, he has not attempted to contact respondent or the subject child, either directly or through an intermediary (trl at 35, line 23 through 37, line 5). Petitioner only learned of the subject child’s autism diagnosis and associated difficulty with strangers, long car rides, and loud noises after commencement of this action (trl at 37, lines 22-24; trl at 37, line 25 through 39, line 12).
On cross-examination by the Attorney for the Child (AFC), petitioner disputed—despite his conviction and a fact-finding order to the contrary (petitioner’s exhibit 4)—the facts underlying his conviction for murder and the related finding of abuse: specifically, that petitioner repeatedly struck and ultimately killed his then girlfriend’s three-year-old daughter, in front of her younger brother, because she was not eating her food or listening to petitioner, who then failed to seek medical attention for her (trl at 40, line 7 through 44, line 15). Petitioner conceded that while he has not seen the subject child since his incarceration, he had seen the victim’s mother, who called “virtually every day,” several dozen times (trl at 47, line 16 through 48, line 7). Asked why he did not file his custody petition until 2014, petitioner responded that he was waiting for *1070 the resolution of his criminal case, because he did not know how far away he would eventually be incarcerated, if at all (trl at 26, lines 1-23).
Petitioner believes visitation to be in the subject child’s best interest because visitation would allow the child to know and understand petitioner (trl at 32, lines 18-22). Petitioner testified that visitation would be appropriate, and could be effectuated with the assistance of his mother and two brothers, who visit monthly and could provide transportation for the subject child (trl at 20, lines 15-18; at 22, lines 15-18).
B. Paternal Grandmother G.F.’s Testimony
G.F., proposed by petitioner to be the “visiting resource” charged with transporting the subject child to visit petitioner, testified that she was present at the hospital when the subject child was born, and each day during the month that the child remained in the hospital (tr2 at 5, lines 14-20). After petitioner and respondent ended their relationship, Ms. F. saw the child biweekly on weekends. During those visits, petitioner’s interactions with the child were positive (tr2 at 7, line 2 through 10, line 6). When Ms. F. accompanied the child to the park, she observed that he played well with other children, but spoke very little (trl at 68, line 20 through 69, line 24).
Ms. F. visited petitioner at the prison at least a dozen times, often with her sons and usually on weekends (trl at 93, lines 16-18; tr2 at 14, lines 12-14; at 16, line 19 through 17, line 3). Each trip was approximately two hours each way by car (trl at 15, lines 1-7). She described a general visitation area with tables and chairs, a separate children’s area with a television and games, vending machines, and a security presence (tr2 at 12, line 24 through 14, line 18; at 17, lines 5-9). She characterized the noise level as “only people talking” (tr2 at 14, line 213). She observed children ranging in age from infants to teenagers (tr2 at 14, lines 12-14; at 16, line 19 through 17, line 3).
On cross-examination by respondent, Ms. F. testified that she was aware of the subject child’s autism diagnosis, but unaware of any sensitivity to strangers, loud noises, and long car rides (tr2 at 20, line 5 through 21, line 3). In the last two years, during which time Ms. F. has not seen the child, she sent neither presents nor Christmas cards, and has not reached out to respondent for updates on the child’s well-being; she admitted to being “a stranger” to the child (tr2 at 22, line 16).
On cross-examination by the AFC, Ms. F. testified that she first learned of the child’s autism diagnosis in 2012 (tr2 at 23, *1071 lines 10-14). Since then, Ms. F. has not spoken with the child’s doctors or teachers, has not served the child any meals, does not know his favorite foods or television show, is unfamiliar with self-soothing mechanisms or techniques used by the child, and does not know if he has any dietary restrictions (tr 2 at 24, line 15 through 25, line 4). On re-direct, Ms. F. testified that, if informed, she would have no difficulty complying with any instructions on the child’s specific needs (tr2 at 27, line 3 through 28, line 3).
C. Respondent’s Testimony
Respondent confirmed that she and petitioner were in a three-year relationship and had one child (tr2 at 31, lines 2-8). Respondent acknowledged that petitioner “help[ed] as a dad,” and confirmed the visitation frequency testified to by Ms. F.: every two weeks (tr2 at 31, lines 14-21). She also confirmed that petitioner last saw the child two weeks before petitioner’s incarceration, when the child was two years old (tr2 at 31, line 24 through 32, line 8).
Respondent and the child now reside in Clifton, New Jersey, where the child attends third grade (tr2 at 32, line 21 through 33, line 4) in a specialized school setting and receives physical, occupational, and speech therapy (tr2 at 33, line 24 through 35, line 1). The child was diagnosed at age two with autism, which causes frequent tripping, sensitivity to loud noises, and sudden outbursts of yelling (tr2 at 33, lines 11-16). Additionally, while the child is physically able to travel, respondent rarely travels with him for over an hour because he is unable to sit still (tr2 at 37, lines 6-19).
Accordingly, respondent opposes visitation at the prison because “[the child is] not aware of what the sounds and noises are . . . strange people around him, he’s not okay speaking with them. He will tell them, no, he will yell at times for ten minutes straight” (tr2 at 38, lines 20-24). Exposed to loud noises, the child would “cover his ears and start shaking, yelling, it’s too loud” (tr2 at 39, lines 16-20). Given instructions, “he’ll say, no” (tr2 at 39, line 21 through 40, line 5). Respondent testified that despite Ms. F.’s testimony to the contrary, respondent informed Ms. F. of the child’s diagnosis and symptoms (tr2 at 35, lines 10-19). Since petitioner’s incarceration, respondent has received no communication from petitioner (tr2 at 36, lines 3-6). Since the last visit in 2014, Ms. F. has not communicated with the child by telephone (tr2 at 36, lines 23-25). Taking the child to visit the prison herself would be logistically *1072 difficult because she has two other young children, and would have to take them by bus (tr2 at 40, line 6 through 41, line 9).
Even if she could secure childcare for her two other children, travel to the prison by any means would be made difficult by the child’s medical condition (tr3 at 5, lines 9-17). For example, during the child’s longest car trip of 30 minutes, he was unable to sit still (tr3 at 5, line 18 through 6, line 2). Similarly, during the child’s longest trip by train, to the Coney Island Aquarium, he reacted to strangers by hiding behind his mother (tr3 at 8, lines 4-6). When the child goes to school by bus, a 10-minute trip, he is accompanied by a bus matron (tr3 at 9, line 9 through 10, line 3). The child is frequently frightened by loud noises and conversations (tr3 at 10, lines 4-11).
On cross-examination by the AFC, respondent elaborated upon the child’s condition. Because of his physical difficulties, the child has a modified physical education program (tr3 at 21, lines 5-8). He “jumbles his words,” making it difficult to communicate (tr3 at 21, line 11 through 22, line 4). He sometimes runs away (tr3 at 22, line 3 through 23, line 8). He requires frequent supervision (tr3 at 23, lines 17-20). He was potty-trained at age five, but still has accidents and requires assistance with bathroom functions and dressing (tr3 at 23, line 24 through 24, line 24). He is a “picky eater,” a significant fact because food rewards are sometimes used to reward positive behavior (tr3 at 25, 23 through 26, line 14).
D. Parties’Arguments
Petitioner relies upon the traditional presumption in favor of a father’s visitation rights absent exceptional circumstances which, according to petitioner, are not present here. Petitioner essentially argues that, making certain allowances for the child’s special needs, visitation could reasonably be arranged using petitioner’s mother, Ms. F., to facilitate the two-hour trip to the prison.
Respondent and the AFC oppose, arguing that visitation with petitioner would not be in the child’s best interest. They argue, essentially, that the child’s sensitivity to unfamiliar places and people, difficulty with loud noises and long trips, physical limitations, and other symptoms associated with his diagnosis, as well as petitioner’s lack of understanding of these symptoms, would complicate visitation. Respondent and the AFC also argue that even if these conditions could be managed on the trip to the prison, the prison itself is unsuitable to the child’s special needs. Finally, respondent and the AFC also contend *1073 that petitioner has done nothing to warrant visitation; that is, petitioner has had no relationship with the child for six years, and petitioner’s crime indicates an inability to meet the child’s needs, particularly in light of petitioner’s failure, during his incarceration, to learn how to manage his anger or attempt to build a relationship with the child.
Discussion
In considering questions of child custody, any court must make every effort to determine “what is for the best interest of the child, and what will best promote its welfare and happiness” (Eschbach v Eschbach, 56 NY2d 167, 171 [1982], citing Domestic Relations Law § 70).
A rebuttable presumption in favor of visitation applies even when the parent seeking visitation is incarcerated (Matter of Granger v Misercola, 21 NY3d 86, 91 [2013]). While an award of visitation is always conditioned upon a consideration of the best interests of the children, “denying visitation to a [biological] parent is a drastic remedy and should only be done where there are compelling reasons . . . , and there must be substantial evidence that such visitation is detrimental to the child’s welfare” (Matter of Rhynes v Rhynes, 242 AD2d 943, 944 [4th Dept 1997]; Matter of Rogowski v Rogowski, 251 AD2d 827, 827 [3d Dept 1998]).
Petitioner’s incarceration, standing alone, does not make a visitation order inappropriate, but a demonstration that such visitation would be harmful to the child, or otherwise not in the child’s best interest, will justify denying such a request (id.; Matter of Ellett v Ellett, 265 AD2d 747, 747 [3d Dept 1999] [affirming Family Court denial of visitation with leave to attempt reasonable mail and telephone contact and a subsequent petition after considering severity of petitioner’s sentence, 10-hour round trip to prison, the tender age of the child, petitioner’s virtually nonexistent previous relationship with this daughter, the fact that travel arrangements would be provided by a grandparent, and the child’s lack of visitation experience in a prison setting]; Matter of Teixeria v Teixeria, 205 AD2d 545, 546 [2d Dept 1994] [Family Court decision denying incarcerated father’s petition for visitation with seven year old with Down syndrome upheld where testimony of the child’s school psychologist established that the child’s condition would prevent her from receiving any benefit from the proposed visitation, 12-hour round trip would be detrimental, father previ *1074 ously made no effort to develop a relationship, abusive behavior toward mother caused her to flee, and father had an extensive criminal history and was incarcerated for a brutal murder]; cf. Matter of Rhynes v Rhynes, 242 AD2d 943, 944 [4th Dept 1997] [reversing Family Court’s denial of incarcerated father’s visitation petition where the only expert witness, a child psychologist, testified that visitation would be beneficial and it was “apparent from the record that the court denied visitation based upon the extreme opposition of respondent mother and the cost and inconvenience to her”]).
In deciding whether the presumption is rebutted, the possibility that a visit to an incarcerated parent would be harmful to the child must be considered, together with other relevant facts (Granger, 21 NY3d at 91). Visitation should be denied where it is demonstrated that under all the circumstances visitation would be harmful to the child’s welfare, or that the right to visitation has been forfeited {id.). This burden must be met by a preponderance of the evidence, utilizing “substantial evidence”; phrased another way, “upon a demonstration—that visitation would be harmful to the child—that proceeds by means of sworn testimony or documentary evidence” {id. at 91-92).
Here, even considering the presumption in favor of visitation, that presumption is readily rebutted by the record. Teix-eria and Ellett are particularly persuasive; both cases relate to visitation petitions filed by fathers incarcerated for violent crimes who, prior to incarceration, had not made significant attempts to build a relationship with their child. The only difference between those cases and the facts here is the duration of the travel required for visitation—10 and 12 hours versus four. However, given the testimony and evidence before the court regarding the subject child’s difficulty with lengthy travel, a four-hour round trip with individuals acknowledged to be “strangers” would be equally taxing.
In addition to the difficulties inherent in the child’s travel to the prison, the visit itself would present additional complications. Petitioner was unable to describe the children’s visitation area with any detail and admitted that he had not investigated its suitability to the child’s needs. The broader visitation area, though described as quiet, is not guaranteed to be so. Neither petitioner nor the family members proposed to accompany the child know the child well and are not trained in dealing with any potential outbursts or any associated sooth *1075 ing mechanisms. Perhaps most problematically, petitioner did not know whether the child would be subjected to a strip search. Moreover, if any issues arose, either during the trip or the visit itself, the child might have difficulty expressing his needs.
Additionally, though petitioner appears to have had a stable and positive relationship with the child until the time of his incarceration, that relationship existed several years ago, before the child’s symptoms, each requiring active management and supervision, manifested themselves. Since his incarceration, petitioner has not made any earnest attempts to build any relationship with the subject child, or undertaken any serious efforts to educate himself about his child’s diagnosis or needs. These deficiencies are particularly noteworthy given petitioner’s admittedly frequent contact, during the same time frame, with the mother of petitioner’s murder victim.
Moreover, the brutal facts underlying petitioner’s conviction take on added significance because of the child’s special needs. That is, petitioner’s denials notwithstanding, he was convicted of murdering a young child with blunt force trauma after losing his temper in response to that child’s failure to follow his instructions. The subject child’s documented instances of uncooperative behavior stemming from his condition— particularly in response to people whom the child considers to be a stranger—counsel against allowing petitioner to visit with the child, even under supervision. Petitioner has failed, as of the date of his testimony, to address the conduct and issues underlying his conviction.
Accordingly, it would be inappropriate, at this time and based on the current record, to permit petitioner to have in-person visitation rights. Petitioner may, however, communicate with the subject child through letters, cards, and similar writings in monthly correspondence (see e.g. Matter of Bougor v Murray, 283 AD2d 695, 696 [3d Dept 2001] [upholding Family Court decision limiting contact with child where father was incarcerated, perpetrated domestic violence against mother while she was pregnant with the child, struck the child in the face during a visitation, and failed to establish a meaningful relationship with his son]).
Conclusion
For the foregoing reasons, it is hereby ordered that the petition of petitioner E.A. for visitation is denied, with leave to file *1076 a renewed petition upon a showing of changed circumstances, except that petitioner shall be permitted to immediately contact the subject child through letters, cards, and similar writings in monthly correspondence.

. “Trl,” “tr2,” and “tr3” refer to the transcripts of proceedings on July 6, 2016, September 22, 2016, and December 12, 2016, respectively.

. This section represents the court’s findings of fact after trial, except where specific disputes and testimony are noted.