# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00251-SCT

*NOLANA THORNTON GRIFFIN*

*v.*

*CHAD GRIFFIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/07/2016 |
| TRIAL JUDGE: | HON. WAYNE SMITH |
| TRIAL COURT ATTORNEYS: | JOHN BENJAMIN ROWLEY |
| | GARY L. HONEA |
| | WILLIAM E. GOODWIN |
| COURT FROM WHICH APPEALED: | WALTHALL COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | TODD BRENTLEY OTT |
| | GARY L. HONEA |
| ATTORNEY FOR APPELLEE: | WILLIAM E. GOODWIN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 02/01/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE RANDOLPH, P.J., MAXWELL AND BEAM, JJ.

## MAXWELL, JUSTICE, FOR THE COURT:

¶1. Mississippi law presumes visitation with the noncustodial parent is in the best interest of the child. But under the circumstances here—where an incarcerated mother sought a court order requiring her four children, one of whom has a social disability, to drive four hours to visit her in prison, every other week—the chancellor found it was not. In reaching this decision, the chancellor applied the correct legal standard and supported his decision with

substantial evidence. Given the broad deference afforded chancellors in visitation matters, we affirm.

**Background Facts and Procedural History**

¶2. Nolana and Chad Griffin married in 2001. They had four daughters together—one born in 2001, another born in 2004, and twins born in 2009.

¶3. Nolana was a high school teacher for the Walthall County School District. In early 2014, she confessed to Chad that she had engaged in sexual relationships with four of her teenaged students. Chad, an officer with the Mississippi Bureau of Narcotics, immediately contacted the district attorney. In April 2014, Nolana pled guilty to four counts of sexual battery of a minor by a person of trust or authority.[1] For each count, Nolana was sentenced to twenty-five years in the custody of the Mississippi Department of Corrections, with ten years suspended and the sentences to be served concurrently.[2] She was immediately remanded into custody and later transferred to the Washington County Correctional Facility in Greenville, Mississippi, four hours away.

¶4. According to Nolana, she and Chad "carried on as a married couple" for the first fifteen months of her imprisonment. Chad called her daily and regularly visited the prison. But in 2016, after starting a romantic relationship with his daughters' homeschool teacher,

---

[1] *See* Miss. Code Ann. § 97-3-95(2) (Rev. 2014) ("A person is guilty of sexual battery if he or she engages in sexual penetration with a child under the age of eighteen (18) years if the person is in a position of trust or authority over the child including . . . the child's teacher[.]").

[2] Her sentences totaled fifteen years.

Chad filed for a divorce based on Nolana's incarceration.[3] Following a hearing at which both Nolana and Chad testified, the chancellor granted the divorce and awarded Chad physical and legal custody of the four girls, who were now fifteen, twelve, and seven years old.

¶5. While the Washington County Corrections Facility permits Nolana Saturday morning visits every other week, the chancellor declined to order any in-person visitation. Nolana offered testimony from the correctional facility's administrative assistant, Linda Jennings. Jennings testified the facility encourages family visits and tries to make them as smooth as possible. The girls would be frisked by a female officer. And even though visitation would occur in a communal room with other potentially violent offenders, in her years of oversight Jennings had never witnessed any problem. But Chad testified about his personal experience visiting Nolana in Greenville. He described what it was like to drive up to the prison. He also recounted his being searched by guards and walking through barbed-wire fences and metal gates. According to him:

> Once I went through that process of seeing what it takes to go through a visitation for me, even as an adult, . . . as upsetting as it was to go through that process and seeing Nolana differently than I had ever seen her, it was very much a struggle just preparing myself for the visit. It's a four hour trip there. It's a four hour visit, and it's a four hour drive home, and it's physically and emotionally exhausting, and that was twice a month. And I just do not feel like it is in the best interest of my children for them to go through that and see their mother in that state.

¶6. The chancellor ultimately agreed with Chad. He found court-ordered, bi-weekly visitation with their mother in prison was not in the girls' best interest. Instead, the final

---

[3] *See* Miss. Code Ann. § 93-5-1 (Supp. 2017) (providing as one of the twelve statutory grounds for divorce: "Being sentenced to any penitentiary, and not pardoned before being sent there").

divorce judgment directed Chad to "determine if and when the children will have visitation with their mother . . . as he may deem fit and proper." The chancellor found Chad "was a believable, sincere witness and that he will take the best interest of the children into account concerning any potential visitation with their mother."

¶7. In his final order, the chancellor gave five specific reasons for his visitation decision:

A. All visitation would occur at the women's prison where Nolana Thornton Griffin is presently located;

B. The testimony indicates that the prison is in Greenville, Mississippi, which is 4 to 4 1/2 hours away from the home of Chad Griffin;

C. That any visit would require that all parties would be searched before entering the visitation facility;

D. The visitation area is open and may expose the children to violent offenders;

E. It is the opinion of the Court that it is in the best interest of the children that they not be required to visit their Mother in prison.

¶8. The order further explained why the chancellor found prison visitation was not in the children's best interest: "The testimony indicated that one child has a condition [(Asperger's Syndrome)] which may be affected by a visitation. Further, the children are not totally aware of their mother's situation." Nolana testified she and Chad opted against telling the children about her legal situation because they did not expect her to be incarcerated. Both she and Chad had "expected [Nolana] to come home th[e] afternoon" she entered her plea. When she was remanded to serve her essentially fifteen-year sentence, reality set in. Chad testified that all he could think to do "when [he] pulled up in that driveway and those four precious babies ran out there and said, where is mommy, was to tell them that she was sick." After some

4

time, Chad told the two older girls Nolana was in jail. But he did not tell them why. The twins have never been told anything other than their mother is sick.

¶9. The chancellor did, however, grant Nolana phone visitation, permitting her to call her daughters four evenings a week. He also ordered Chad to timely supply Nolana with all her children's grades, school updates, and medical and dental-care statements.

¶10. After an unsuccessful motion to alter or amend the judgment,[4] Nolana appealed.

**Discussion**

¶11. Nolana's appeal focuses solely on the chancellor's decision not to order visitation but instead to let Chad decide when his daughters should visit their mother in prison. As with other domestic matters, "[t]he chancellor has broad discretion when determining appropriate visitation and the limitations thereon." *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994) (citations omitted). And "this Court will not disturb those findings unless his findings are not supported by substantial credible evidence, he has committed manifest error, or he has applied the erroneous legal standard." *Christian v. Wheat*, 876 So. 2d 341, 345 (Miss. 2004) (citing *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997)).

¶12. Nolana insists the chancellor applied an erroneous legal standard by finding her incarceration, in and of itself, was sufficient to overcome the legal presumption that she is entitled to visitation. According to Nolana, visitation at a correctional facility is not *per se* an adverse circumstance justifying the denial of visitation. Therefore, she is entitled to the presumption that visitation is in the best interest of her children—a presumption grounded

---

[4] *See* Miss. R. Civ. P. 59(e).

5

in the constitutional right of a parent to "the companionship, care, custody, and management of his or her children.'" *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 2159-60, 68 L. Ed. 2d 640 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212, 31 L. Ed. 2d 551 (1972)).

¶13. This Court certainly is sensitive to Nolana's rights as a parent. And she is absolutely correct—a noncustodial parent *is* presumptively entitled to visitation. *Cox v. Mounds*, 490 So. 2d 866, 870 (Miss. 1986). But we have recognized that presumption can be overcome when "substantial evidence" justifies doing so. *Id.*; *cf. also Newsom v. Newsom*, 557 So. 2d 511, 517 (Miss. 1990) (holding "that the chancery court has the power to restrict visitation in circumstances which present an appreciable danger of hazard cognizable in our law"). Indeed, while a chancellor must "always be[] attentive to the rights of the non-custodial parent" and "recogniz[e] the need to maintain a healthy, loving relationship between the non-custodial parent and his child," the "paramount concern" in visitation is the best interest of the child. *Harrington*, 648 So. 2d at 545.

¶14. We have never addressed head-on the impact of a noncustodial parent's incarceration on his or her right to visitation. The issue was raised but not reached in *Christian v. Wheat*. *Christian*, 876 So. 2d at 346. In dicta, however, we did note that "[j]urisdictions which have reached the question of visitation rights of incarcerated parents generally express that incarceration, alone, is not sufficient to preclude visitation." *Id.*[5] *See also, e.g., Davis v.*

---

[5] *See Christian*, 876 So. 2d at 346 n.1 (citing *Nicholson v. Choctaw Cty.*, 498 F. Supp. 295 (S.D. Ala. 1980); *Valentine v. Englehardt*, 474 F. Supp. 294 (D.N.J. 1979); *O'Bryan v. Cty. of Saginaw*, 437 F. Supp. 582 (E.D. Mich. 1977); *Mabra v. Schmidt*, 356 F. Supp. 620 (W.D. Wis. 1973); *Michael M. v. Ariz. Dep't of Econ. Sec.*, 42 P.3d 1163,

***Davis***, 648 N.Y.S.2d 742, 743 (N.Y. App. Div. 1996) ("It is generally presumed to be in a child's best interest to have visitation with his or her noncustodial parent and the fact that a parent is incarcerated will not, by itself, render visitation inappropriate."). Today, we follow those jurisdictions and hold that incarceration, in and of itself, is not sufficient to overcome the presumption that a noncustodial parent is entitled to visitation.

¶15. Applying this holding, we find no reversible error in the chancellor's decision. Contrary to Nolana's assertion, the chancellor did not base his visitation decision solely on the fact Nolana is incarcerated. Instead, with the "paramount concern" in mind, he found that, based on the circumstances, the presumption in favor of visitation had been overcome and that court-ordered, every-other-week visitation with Nolana was not in the children's best interest. He supported his decision with substantial evidence that judge-mandated visitation may be physically and emotionally harmful to the girls. The chancellor was swayed by a variety of factors. One was the physical distance the girls would have to travel twice each month (eight to nine hours round trip). Others included the requirement of a pat-down physical search, the location of the jail visits (in a communal room where potentially violent offenders were also visiting family), the oldest daughter's social disability (Asperger's Syndrome), and the fact Nolana's daughters had not seen their mother since her arrest and

---

1165 (Ariz. Ct. App. 2002); ***In re Smith***, 169 Cal. Rptr. 564 (Ca. Ct. App. 1980); ***Hoversten v. Superior Court***, 88 Cal. Rptr. 2d 197 (Cal. Ct. App. 1999); ***Smith v. Smith***, 869 S.W.2d 55, 57 (Ky. Ct. App. 1994); ***Nielsen v. Nielsen***, 348 N.W.2d 416 (Neb. 1984); ***Hervieux v. Hervieux***, 603 A.2d 337, 338 (R.I. 1992); ***Suttles v. Suttles***, 748 S.W.2d 427, 429 (Tenn. 1988)).

were unaware of her sexual ventures leading to her arrest and conviction, much less that she was even incarcerated.

¶16.    We note the chancellor's decision is in line with other courts that have denied prison visitation in similar circumstances. Recently, a New York family court—after emphasizing that the law presumes visitation is in the child's best interest, even when the noncustodial parent is incarcerated—denied an incarcerated father visitation with his son with autism, a social disorder related to Asperger's Syndrome. *E.A. v. R.A.*, 56 N.Y.S.3d 815, 820 (N.Y. Fam. Ct. 2017). The court found the presumption in favor of visitation had been rebutted by evidence of social stress the prison visit may have on his son, the fact the child may be strip-searched, the four-hour drive, and that the son had not seen his father since his incarceration. *Id. See also Davis*, 628 N.Y.S.2d at 743 (affirming the family court's decision to deny an incarcerated father visitation based on the "militating evidence" prison was three-and-a-half hours away and child had medical condition making it unwise for him to travel away from home frequently).

¶17.    In Louisiana, an incarcerated father was likewise denied visitation. *Davis v. Davis*, 494 So. 2d 1315, 1318 (1986) (La. Ct. App. 1986). The father had been sent to prison in Texas for sexually assaulting his children's twelve-year-old babysitter. Like Nolana, he requested Saturday morning visitation, twice monthly, but was denied. On appeal, the Louisiana Court of Appeals agreed that bi-weekly visitation with their father "would prove traumatic for children of their tender years," especially considering the distance to be traveled (as in this case, a four-and-a-half hour drive one way), the recentness of the conviction, the

8

security measures the children would undergo, and the children's relationship to their father's victim. *Id.* Thus, the court could not "say that the trial court abused its great discretion in concluding that at this time the children's best interests would not be served by allowing such visitation." *Id.*

¶18. The Louisiana court, however, was quick to caution that it "d[id] not mean to imply that the father has forfeited his right of visitation." Rather, it viewed the trial court's ruling "more akin to a suspension of the father's visitation privileges until such time as it would be easier for the children to cope with the strain inherent in this situation." *Id.* "In denying visitation at this time, but allowing the father to correspond with the children," the appellate court believed the "trial judge has attempted to provide a means for the father to re-establish a relationship with the children gradually." *Id.* The hope was to work toward a situation "where limited visitation will prove acceptable." *Id.*

¶19. The chancellor here similarly provided a means for Nolana to maintain her relationship with her daughters with the eventual goal being visitation. He granted Nolana substantial phone visitation. She was also to be kept informed by Chad of the goings-on in her children's lives. And the chancellor encouraged Chad to allow his daughters to visit their mother if and when Chad determined it appropriate.

¶20. This Court has recognized "that children of divorced parents should be encouraged to have a close, affectionate and, *under the circumstances*, as normal as possible a parent-child relationship." *Cox*, 490 So. 2d at 870 (emphasis added). And based on the facts before him, that is what the chancellor tried to do. The chancellor considered Nolana's

circumstances and deemed phone visitation, for now, and possible future in-person visitation at Chad's discretion was the best possible balance between recognizing Nolana's constitutionally protected rights, encouraging the parent-child relationships, and protecting the girls' best interest. *See **Harrington***, 648 So. 2d at 545. Therefore, the chancellor's decision is entitled to the "great deference" this Court typically gives chancellors when determining visitation. ***Newsom***, 557 So. 2d at 515.

¶21. Because of this deference, we affirm the divorce decree, which included no court-ordered visitation with Nolana.

¶22. **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ.**

10